UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESILIENT FLOOR COVERING PENSION FUND, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>FLOOR COVERING CONTRACTS,<br><br>    Defendant. | Case No. 20-cv-03577-EMC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**<br><br>Docket No. 17 |

Plaintiffs are the Resilient Floor Covering Pension Fund and its Board of Trustees. They have filed suit against Defendant Floor Covering Contracts ("FCC"), a sole proprietorship, seeking to collect delinquent withdrawal liability. Currently pending before the Court is Plaintiffs' motion for a default judgment. FCC did not file an opposition to Plaintiffs' motion, nor did it make an appearance at the hearing on Plaintiffs' motion. Having considered the papers submitted, the Court hereby **GRANTS** Plaintiffs' motion for relief.

## I.    FACTUAL & PROCEDURAL BACKGROUND

As noted above, the instant case concerns withdrawal liability. *See* 29 U.S.C. § 1381(a) ("If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part [29 U.S.C. §§ 1381 et seq.] to be the withdrawal liability."). Withdrawal liability is provided for by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). As the Supreme Court has explained, the MPPAA helped to

> solve a problem that became apparent after Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U.S.C. § 1001 *et seq.* ERISA helped assure private-

> sector workers that they would receive the pensions that their employers had promised them. To do so, among other things, ERISA required employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities; it mandated termination insurance to protect workers against a plan's bankruptcy; and, if a plan became insolvent, it held any employer who had withdrawn from the plan during the previous five years liable for a fair share of the plan's underfunding.
>
> Unfortunately, this scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat. Consequently, a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise. MPPAA helped eliminate this problem by changing the strategic considerations. It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty. That is to say, it imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent).

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416-17 (1995).

The MPPAA thus "requires that an employer withdrawing from a multiemployer pension play pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 725 (1984).

"To trigger application of the statute, the pension plan must issue a notice, and a demand for payment of, withdrawal liability to the employer." *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371-72 (7th Cir. 1992); *see also* 29 U.S.C. § 1399(b).

> No later than 90 days after the plan assesses the liability, "the employer [] (i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments, (ii) may identify any inaccuracy in the determination of the amount of unfunded vested benefits allocable to the employer, and (iii) may furnish any additional relevant information from the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). "After a reasonable review of any matter raised, the plan sponsor shall notify the employer of [] (i) the plan sponsor's decision, (ii) the basis for the decision, and (iii) the reason for any change in the determination of the employer's liability or schedule of liability payments." *Id.* at § 1399(b)(2)(B).

> Then, within prescribed time limits, either party may initiate arbitration, and "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan" over withdrawal liability as determined under the enumerated statutory provisions "shall be resolved through arbitration." *See* 29 U.S.C. § 1401(a)(1). "The arbitration clause is not a jurisdictional prerequisite to federal court review, but it is a requirement for exhaustion of administrative remedies." *Irigaray Dairy*, 2015 U.S. Dist. LEXIS 171875, 2015 WL 9319448, at *4. If an employer fails to demand arbitration, the assessment becomes due and owing on the schedule provided by the plan. *See* 29 U.S.C. § 1401(b)(1).

*Dairy Emples. Union Local No. 17 Christian Labor Ass'n of the United States Pension Tr. v. Vander Poel & Son Dairy*, No. CV 12-4550 FMO (OPx), 2016 U.S. Dist. LEXIS 31811, at *13-14 (C.D. Cal. Mar. 10, 2016). "The plan sponsor may [then] bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1).

In the instant case, Plaintiffs allege as follows with respect to withdrawal liability on the part of FCC and/or have provided evidence on withdrawal liability as follows:

- FCC "was a participating employer in the Pension Fund since at least 2005." Docket No. 22 (Christophersen Decl. ¶ 3).
- In September 2011, FCC agreed to be bound by a collective bargaining agreement pursuant to which contributions would be made to the Pension Fund. *See* Docket No. 22 (McDonough Decl., Ex. 1) (Sacramento Area Addendum to the Northern California Floor Covering Master Agreement, art. 37); *see also* Compl. ¶ 10 ("For a period of time prior to and including 2015, FCC was a signatory or otherwise bound by a Collective Bargaining Agreement . . . with District Council 16, of the International Union of Painters and Allied Trades . . . , under which FCC agreed to accept and be bound by all the terms, provisions, and conditions of the CBA. The CBA obligated FCC to pay contributions to the Pension Fund in specified amounts for each hour worked by employees performing work covered by the CBA.").
- "Effective July 1, 2015, FCC withdrew from participation in the Pension Fund, ceased to contribute to the Pension Fund with respect to the work of employees covered by the CBA, and completely withdrew from the Pension Fund within the meaning of ERISA, 29 U.S.C. § 1383." Compl. ¶ 11; *see also* 29 U.S.C. § 1383(a).

3

- "The Pension Fund made a determination of the amount of FCC's withdrawal liability in compliance with all the statutory requirements and the rules of the Pension Fund. The Pension duly notified Defendant of the determination and made a demand for payment by letter dated April 18, 2016 to the Defendant. That letter sets forth the schedule of payments." Compl. ¶ 13; *see also* 29 U.S.C. § 1399(b); Docket No. 22 (Christophersen Decl., Ex. 1) (letter). Under that schedule, the first payment was due in mid-June 2016. *See* Compl. ¶ 14.

- In mid-June 2016, FCC wrote a letter to the Pension Fund disagreeing that it had withdrawal liability. *See* Docket No. 22 (Christophersen Decl., Ex. 2) (letter) (asserting that "the Special Rules for Construction Industry . . . or the Construction Exemption to Withdrawal Liability[] applies to my situation"; adding that "I have not been making any meaningful contributions since 2008 after I became of retirement age," and, though "I have tried and tried to notice my withdrawal[,] each time I was told I could not withdraw"). The Pension Fund responded by letter in late June 2016, denying FCC's request for review. In the same letter, the Pension Fund notified FCC that it had sixty days to challenge the Pension Fund's decision by initiating arbitration. *See* Docket No. 22 (Christophersen Decl., Ex. 3) (letter). FCC did not initiate arbitration or make a withdrawal liability payment. *See* Compl. ¶ 15; *see also* 29 U.S.C. § 1401(a).

- "In late 2016, the Pension Fund's former administrator, ATPA, collapsed in a sudden and chaotic bankruptcy. . . . Because there was concern that correspondence or payments might be lost, the Pension Fund sent a second withdrawal notice to FCC . . . in [February] 2017." Docket No. 22 (Christophersen Decl. ¶ 9). In this notice, the Pension Fund asked that the first payment be made by April 14, 2017. *See* Compl. ¶ 16; *see also* Docket No. 22 (Christophersen Decl., Ex. 5) (letter). FCC did not make a payment by April 2017 or thereafter. *See* Compl. ¶ 17.

- The full withdrawal liability owed is $56,376. *See* Compl. ¶ 18. The Pension Fund also seeks liquidated damages, interest, attorney's fees, and costs, as provided for

4

1 by the CBA, Trust Agreement, and/or 29 U.S.C. §§ 1451 and 1132.

2 Plaintiffs served the summons and complaint on FCC on July 1, 2020.  *See* Docket No. 11

3 (proof of service).  On August 20, 2020 – after FCC failed to respond to the complaint – Plaintiffs

4 moved for entry of default.  *See* Docket No. 12 (motion).  The Clerk of the Court entered FCC's

5 default on August 24, 2020.  *See* Docket No. 13 (notice).  Plaintiffs subsequently filed the pending

6 motion for default judgment on October 29, 2020.  FCC has not filed an opposition to the motion.

7 Nor did FCC make an appearance at the hearing on the motion, held on December 1, 2020.

## **II.     DISCUSSION**

A.     Service of the Summons and Complaint

Before evaluating the merits of Plaintiffs' motion, the Court briefly addresses Plaintiffs' service of the summons and complaint on FCC – *i.e.*, to ensure that FCC's failure to appear in this case is not because of improper service.  Plaintiffs have filed a declaration from a process server testifying that service was effected on FCC by personally delivering a copy of the summons and complaint on Gerald Box, the owner of FCC (a sole proprietorship).  *See* Docket No. 11 (proof of service).  Personal delivery satisfies Federal Rule of Civil Procedure 4.  *See* Fed. R. Civ. P. 4(e)(2) (providing that an individual may be served by "delivering a copy of the summons and of the complaint to the individual personally").  The Court therefore concludes that service of the summons and complaint on FCC was properly effected.

B.     Merits of Default Judgment Motion

As noted above, the Clerk of the Court entered FCC's default on August 24, 2020.  *See* Docket No. 13 (notice).  After entry of default, a court may grant a default judgment on the merits of the case.  *See* Fed. R. Civ. P. 55.  "The district court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.1980).  A court may consider the following factors in exercising such discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

5

1    *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Because default has already been

2    entered in this case, the Court must construe as true all of "the factual allegations of the complaint,

3    except those relating to the amount of damages." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d

4    915, 917-18 (9th Cir. 1987).  The Court may also consider evidence submitted in conjunction with

5    the motion for default judgment.  *Cf.* Fed. R. Civ. P. 55 (noting that a "court may conduct hearings

6    . . . when, to enter or effectuate judgment, it needs to [*e.g.*] establish the truth of any allegation by

7    evidence" or "investigate any other matter").

8          The Court finds that the *Eitel* factors weigh in favor of granting default judgment.  For

9    example, as to the first factor, if the motion for default judgment were to be denied, then Plaintiffs

10   would likely be prejudiced as they would be left without any remedy.  *See Walters v.*

11   *Shaw/Guehnemann Corp.*, No. 03-cv-04058, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr.

12   15, 2004) ("To deny plaintiff's motion [for default judgment] would leave them without a remedy.

13   Prejudice is also likely in light of the merits of their claims."); *Pepsico, Inc. v. Cal. Sec. Cans*, 238

14   F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not

15   granted, Plaintiffs will likely be without other recourse for recovery.").

16         As for the fourth *Eitel* factor, Plaintiffs' request for monetary damages appears to be

17   tailored to the specific misconduct of FCC.  *See Pepsico*, 238 F.Supp.2d at 1176 (stating that "the

18   court must consider the amount of money at stake in relation to the seriousness of Defendant's

19   conduct").

20         As to the fifth, sixth, and seventh *Eitel* factors, because FCC has not filed an answer to the

21   complaint, there is nothing to suggest that there is a possibility of a dispute concerning material

22   facts.  Nor is there any indication that FCC's default was due to excusable neglect.  And while

23   public policy favors decisions on the merits, *see Eitel*, 782 F.2d at 1472, FCC's choice not to

24   defend this action renders a decision on the merits "impractical, if not impossible."  *PepsiCo*, 238

25   F. Supp. 2d at 1177.

26         Finally, on the second and third *Eitel* factors – *i.e.*, the merits of Plaintiffs' substantive

27   claims and the sufficiency of those claims – the Court finds that Plaintiffs have adequately stated a

28   claim for withdrawal liability.  Plaintiffs have alleged that FCC completely withdrew from the

Pension Fund. They have also alleged, and provided supporting evidence, that they notified FCC of the withdrawal liability and demanded payment from FCC of the withdrawal liability. Finally, they have alleged – and there is no indication to the contrary – that FCC failed to initiate an arbitration.

Accordingly, the Court grants Plaintiffs' motion for default judgment.

C. Damages

1. Withdrawal Liability

As indicated above, the general rule is that, upon a default, a Court construes as true all factual allegations in the complaint, except those relating to the amount of damages. *See TeleVideo*, 826 F.2d at 917-18. The instant case, however, involves withdrawal liability, and, under the MPPAA, if the defendant-employer fails to initiate an arbitration, then "the amounts demanded by the plan sponsor under section 4219(b)(1) [29 U.S.C. § 1399(b)(1)] shall be due and owing on the schedule set forth by the plan sponsor." 29 U.S.C. § 1401(b)(1). The Court therefore holds that Plaintiffs are entitled to the amount of withdrawal liability specified in their demand letters to FCC – *i.e.*, $56,376. *See Dairy Emples. Union Local No. 17 v. Pastime Lakes Dairy, L.P.*, No. EDCV 14-01627-VAP (KKx), 2015 U.S. Dist. LEXIS 57705, at *12 (C.D. Cal. Apr. 30, 2015) (in considering a motion for default judgment, noting that, "if a demand for withdrawal liabilities is made and is not contested timely by the employer, no further evidence is required of the plan to prove damages, as the entire amount is due by operation of statute"); *see also Pension Tr. Fund for Operating Eng'rs v. Kickin Enters.*, No. C-11-03685 JCS, 2012 U.S. Dist. LEXIS 183434, at *17 (N.D. Cal. Dec. 20, 2012) (report and recommendation on motion for default judgment) (noting that "Plaintiffs have presented evidence that upon Kickin's complete withdrawal from the Plan, they sent Kickin a notice of its withdrawal liability, in the amount of $13,249.00, along with a payment schedule, calculated by actuary Horizon Actuarial Services[;] [o]n the basis of this evidence, it is recommended that this amount be awarded in full"), *adopted by* 2013 U.S. Dist. LEXIS 200747 (N.D. Cal. Feb. 14, 2013); *cf. Bd. of Trs. of the Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g Corp.*, 43 F.3d 852, 854 (3d Cir. 1994) (stating that "[a]n employer who wishes to contest the fact of its liability or the amount must initiate

7

arbitration[;] [i]f it does not, it waives the right to contest the assessment and the amounts demanded by the plan sponsor become 'due and owing' as set forth on the payment schedule"); *Robbins v. Chipman Trucking, Inc.*, 866 F.2d 899 (7th Cir. 1988) (stating that "[t]he district court's decision that Chipman's request for arbitration was not timely means that it has waived any defenses it may have raised[;] [s]ince Congress made it mandatory to resolve withdrawal disputes between an employer and a plan sponsor through arbitration (29 U.S.C. § 1401(a)), Chipman cannot bypass arbitration and litigate a defense to a withdrawal liability claim").

2. Other Relief

In addition to withdrawal liability, the Pension Fund seeks liquidated damages, interest, attorney's fees, and costs. Plaintiffs are entitled to such because the MPPAA provides that, "[i]n any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 515 [29 U.S.C. § 1145])." 29 U.S.C. § 1451(b); *see also Kickin*, 2012 U.S. Dist. LEXIS 183434, at *16-17. Section 1145 requires that an employer who is obligated to make contributions to a multiemployer plan under the plan terms or the terms of a collectively bargained agreement shall do so. *See id.* § 1145. An employer who fails to do so is required under 29 U.S.C. § 1132(g)(2) to pay (A) the unpaid contributions; (B) interest on the unpaid contributions; (C) an amount equal to the greater of interest on the unpaid contributions or liquidated damages provided for under the plan; and (D) reasonable attorney's fees. *See* 29 U.S.C. § 1132(g)(2). "Considered together, these provisions mandate the award of § 1132(g)(2) remedies to a pension fund that successfully sues to recover withdrawal liability."[1] *Cent. States, Se. & Sw. Areas Pension Fund v. Ehlers Dist., Inc.*, No. 11 C 2691, 2012 U.S. Dist. LEXIS 94091, at *7 (N.D. Ill. July 9, 2012); *see also Cent. States*, 956 F.2d at 1377 (noting that "[§] 1451[] expressly assimilates failures to satisfy withdrawal liability to violations of section 1145"); *Lads Trucking Co. v. Bd. of Trs.*, 777 F.2d 1371, 1375 (9th Cir. 1985)

---

[1] Title 29 U.S.C. § 1451(e) also provides for attorney's fees: "In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." 29 U.S.C. § 1451(e).

1  (noting that failure to make a withdrawal liability payment within the time prescribed is a
2  delinquency "with mandatory attorneys' fees to be awarded to the pension plan [under] 29 U.S.C.
3  § 1132(g)(2)").

### a. Interest

Plaintiffs calculate that, as of September 8, 2020, interest on the unpaid withdrawal liability is $9,230.12.  *See* Mot. at 8 (reflecting that interest began to accrue as of April 14, 2017). Plaintiffs based their interest calculations off of 29 U.S.C. § 1399(c)(6) and 29 C.F.R. § 4219.32.[2] Plaintiffs' calculations facially appear valid.  Accordingly, the Court grants the interest requested by Plaintiffs.

### b. Greater of Interest or Liquidated Damages

As noted above, under § 1132(g)(2)(C), a plaintiff is entitled to the greater of (1) interest or (2) liquidated damages.  Plaintiffs have provided evidence that, under the Trust Agreement, liquidated damages are $25 per delinquency or 10% of the delinquent contributions, whichever is greater.  *See* McDonough Decl., Ex. 1 (Trust Agmt. ¶ 43).  Here, the delinquent withdrawal liability is $56,376; 10% of that sum is $5,637.60.  Because these liquidated damages are smaller than the interest on the unpaid withdrawal liability, Plaintiffs are entitled to the larger interest amount as an additional award – *i.e.*, another $9,230.12.

### c. Attorney's Fees

At this time, Plaintiffs have not asked for a specific award representing attorney's fees and costs.  Instead, they ask for approximately a month to file a motion for fees and costs.  The Court grants that request.

---

[2] The Court acknowledges that there is a split of authority as to whether interest for unpaid withdrawal liability should be calculated based on § 1399(c)(6)/§ 4219.32 or § 1132(g)(2) instead. *See GCIU-Emplr. Ret. Fund v. Quad/Graphics, Inc.*, No. 2:16-cv-00100-ODW (AFMx), 2017 U.S. Dist. LEXIS 70809, at *14 (C.D. Cal. May 8, 2017).  The Court need not address the issue as there is no indication that the interest amount would materially differ depending on which statute/regulation governed.  As a general matter, interest under § 1399(c)(6)/§ 4219.32 would typically be less.  *See GCIU-Emplr. Ret. Fund*, 2017 U.S. Dist. LEXIS 70809, at *14 ("[I]t appears to the Court that the interest calculation under § 4219.32 applies only where overdue withdrawal payments are collected before litigation commences.  Once the Fund is forced to file an action to collect delinquent interim payments and obtains a judgment for such payments, the harsher remedies under § 1132(g)(2) apply.  This is in keeping with the broader purpose of § 1132(g)(2) to discourage unnecessary litigation by the employer").

### III. CONCLUSION

Plaintiffs' motion for default judgment is granted. Plaintiffs are awarded withdrawal liability in the amount of $56,376; interest in the amount of $9,230.12; and an additional award of interest (in lieu of liquidated damages) in the amount of $9,230.12. The total is **$74,836.24**.

The Court shall not enter a final judgment at this time so that Plaintiffs can move for attorney's fees and costs. Plaintiffs shall file their motion within four weeks of the date of this order.

Plaintiffs shall serve this order on FCC and file a proof of service with the Court.

This order disposes of Docket No. 17.

**IT IS SO ORDERED**.

Dated: December 2, 2020

_____
EDWARD M. CHEN
United States District Judge